**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JERRY A. ANDERSON, SR., LAURA L. LARUE,
and CHRISTOPHER A. LEE on behalf of
themselves and all others similarly situated,

      Plaintiffs,

v.

BRIDGESTONE CORPORATION,
BRIDGESTONE APM COMPANY,
YAMASHITA RUBBER CO., LTD.,
YUSA CORPORATION,
SUMITOMO RIKO COMPANY, LTD.,
DTR INDUSTRIES, INC.,
TOYO TIRE & RUBBER CO., LTD.,
TOYO TIRE NORTH AMERICA OE SALES LLC,
AND TOYO AUTOMOTIVE PARTS (USA), INC.,

      Defendants.

Docket No.

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

     Plaintiffs Jerry A. Anderson, Sr., Laura L. LaRue and Christopher A. Lee, individually and on behalf of a proposed class of direct purchasers of Anti-Vibration Rubber Parts, bring this class action against Defendants under the federal antitrust laws for treble damages and allege as follows.

**NATURE OF THE CASE**

    1.    Beginning at least as early as March 1, 1996, and continuing through such time as the anticompetitive effects of the Defendants' conduct ceased, the Defendants and their co-conspirators—United States and global manufacturers and suppliers of Anti-Vibration Rubber Parts —violated the antitrust laws by entering into a continuing conspiracy to rig bids and fix,

raise, maintain, or stabilize prices of Anti-Vibration Rubber Parts sold in the United States and elsewhere at supra-competitive levels.  As a result of this unlawful conduct, Plaintiffs and other Class members paid artificially inflated prices for Anti-Vibration Rubber Parts and have suffered antitrust injury to their business or property.

2.      Defendants Bridgestone Corporation, Yamashita Rubber Co., Ltd., and Toyo Tire & Rubber Co., Ltd., have pleaded guilty to federal charges and agreed to pay multi-million-dollar criminal fines for their role in a conspiracy to fix prices of Anti-Vibration Rubber Parts installed in cars sold in the United States and elsewhere.

3.      Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 4 of the Clayton Act, 15 U.S.C. § 15, and assert the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiffs, which are based upon personal knowledge.  Plaintiffs' information and belief are based upon, *inter alia*, the investigation made by their attorneys.

## DEFINITIONS

4.      "Anti-Vibration Rubber Parts" are comprised primarily of rubber and metal, and are installed in suspension systems and engine mounts, as well as other parts of an automobile, to reduce engine and road vibration.

5.      The "Class Period" begins at least as early as March 1, 1996, and continues through such time as the anticompetitive effects of the Defendants' conduct ceased.

## JURISDICTION AND VENUE

6.      Plaintiffs bring this action to recover treble damages, costs of suit, and reasonable attorneys' fees resulting from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

2

7.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

8.     Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

9.     The activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.

10.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Anti-Vibration Rubber Parts throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

3

## THE PARTIES

### *Plaintiffs*

11.     Plaintiff Jerry A. Anderson, Sr. is a resident of Bullitt County, Kentucky, who purchased Anti-Vibration Rubber Parts directly from an entity of which one of the Defendants is the ultimate parent during the Class Period.

12.     Plaintiff Laura L. LaRue is a resident of Hardin County, Kentucky, who purchased Anti-Vibration Rubber Parts directly from an entity of which one of the Defendants is the ultimate parent during the Class Period.

13.     Plaintiff Christopher A. Lee is a resident of Harris County, Texas, who purchased Anti-Vibration Rubber Parts directly from an entity of which one of the Defendants is the ultimate parent during the Class Period.

### *The Bridgestone Defendants*

14.     Defendant Bridgestone Corporation is a Japanese corporation with its principal place of business in Kyobashi, Tokyo, Japan.  Bridgestone Corporation—directly and/or through its subsidiaries and other entities of which it is the ultimate parent, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

15.     Defendant Bridgestone APM Company is a Delaware company with its principal place of business in Findlay, Ohio. It is a subsidiary of and wholly owned and/or controlled by its parent, Bridgestone Corporation.  Bridgestone APM Company manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

11181572.1

16.     Bridgestone Corporation dominates and controls its subsidiaries and entities of which it is the ultimate parent, to such an extent, including with respect to pricing, that they are deemed agents of Bridgestone Corporation.

*The Yamashita Defendants*

17.     Defendant Yamashita Rubber Co., Ltd. is a Japanese corporation with its principal place of business in Saitama, Japan.  Yamashita Rubber Co., Ltd.—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

18.     Defendant YUSA Corporation is an Ohio corporation with its principal place of business in Washington Court House, Ohio. It is a subsidiary of and wholly owned and/or controlled by its parent, Yamashita.  YUSA Corporation manufactured, marketed and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

*The Tokai Defendants*

19.     Defendant Sumitomo Riko Company, Ltd., formerly known as Tokai Rubber Industries, Ltd. ("Sumitomo Riko") is a Japanese corporation with its principal place of business in Aichi, Japan.  Sumitomo Riko—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

20.     Defendant DTR Industries, Inc. ("DTR") is an Ohio corporation with its principal place of business in Bluffton, Ohio.  It is a subsidiary of and wholly owned and/or controlled by its parent, Sumitomo Riko.  DTR Industries, Inc. manufactured, marketed, and/or sold Anti-

11181572.1

Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

*The Toyo Defendants*

21. Defendant Toyo Tire & Rubber Co., Ltd. is a Japanese company with its principal place of business in Osaka, Japan. Toyo Tire & Rubber Co., Ltd.– directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

22. Defendant Toyo Tire North America OE Sales LLC is a California company with its principal place of business in White, Georgia. It is a subsidiary of and wholly owned and/or controlled by its parent, Toyo Tire & Rubber Co., Ltd. Toyo Tire North America OE Sales LLC—directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

23. Defendant Toyo Automotive Parts (USA), Inc. is a Kentucky corporation with its principal place of business in Franklin, Kentucky. It is a subsidiary of and wholly owned and/or controlled by its parent, Toyo Tire & Rubber Co., Ltd. Toyo Automotive Parts (USA), Inc.— directly and/or through its subsidiaries, which it wholly owned and/or controlled—manufactured, marketed, and/or sold Anti-Vibration Rubber Parts that were purchased throughout the United States, including in this District, during the Class Period.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

24. The acts alleged in this Complaint to have been done by YUSA Corporation, DTR Industries, Inc.., Bridgestone APM Company and its affiliates, Toyo Tire North America OE

6

Sales LLC, and Toyo Automotive Parts (USA), Inc., were authorized, ordered, and condoned by their respective parent companies.

25.     The acts alleged to have been done by the Defendants and their co-conspirators were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

26.     Other persons and entities not named as defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the conspirators are named as defendants in this Complaint.

27.     Each Defendant acted as a principal or an agent of or for the other Defendants and their co-conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

## INTERSTATE TRADE AND COMMERCE

28.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

29.     During the Class Period, Defendants manufactured, sold, and shipped substantial quantities of Anti-Vibration Rubber Parts in a continuous and uninterrupted flow of interstate and foreign commerce.

## ANTI-VIBRATION RUBBER PARTS

30.     Anti-Vibration Rubber Parts manufactured, distributed or sold by Defendants during the Class Period are not functionally distinguishable from each other in any material respect.

31.     Anti-Vibration Rubber Parts are installed by motor vehicle original equipment manufacturers ("OEMs") in new motor vehicles as part of the manufacturing process.  They are also installed in motor vehicles to replace worn out, defective, or damaged Anti-Vibration Rubber Parts.

32.     OEMs include the Big Three in Detroit (General Motors, Ford and Chrysler) and non-domestic companies that also operate manufacturing plants in the U.S.  For example, during the Class Period, Nissan manufactured motor vehicles in Mississippi and Tennessee, Toyota in Kentucky, BMW in South Carolina, Honda in Ohio and Alabama, Hyundai and Mercedes-Benz in Alabama, and Kia in Georgia.  In addition to OEMs, numerous other direct purchasers, including Plaintiffs and others, purchased Anti-Vibration Rubber Parts directly from an entity of which one of the Defendants is the ultimate parent.

33.     When purchasing Anti-Vibration Rubber Parts, OEMs issue Requests for Quotation ("RFQs") to motor vehicle parts suppliers.  For automotive OEMs, the bidding process begins approximately three years prior to the start of production of a new model platform.  In response, motor vehicle parts suppliers submit quotations or bids and the OEM usually awards the business to the selected motor vehicle part supplier for the anticipated production cycle of the platform, usually four to six years.  Japanese OEMs procure parts for U.S.-manufactured motor vehicles both in Japan and the United States.

34.     Defendants and their co-conspirators supplied Anti-Vibration Rubber Parts to OEMs for installation in motor vehicles manufactured and sold in the United States and elsewhere.  Defendants and their co-conspirators manufactured Anti-Vibration Rubber Parts (a) in the United States for installation in motor vehicles manufactured and sold in the United States, (b) outside of the United States for export to the United States and installation in motor vehicles

8

manufactured and sold in the United States, and (c) outside the United States for installation in motor vehicles manufactured outside the United States for export to and sale in the United States.

35.     During the Class Period, entities of which one of the Defendants is the ultimate parent, and their co-conspirators sold Anti-Vibration Rubber Parts directly to OEMs, suppliers to OEMs, distributors, and other purchasers.

36.     During the Class Period, Defendants and their co-conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Anti-Vibration Rubber Parts.  As a result of their unlawful conduct, Defendants did not compete, but instead conducted their business insulated from competition.

### THE CHARACTERISTICS OF THE MARKET FOR ANTI-VIBRATION RUBBER PARTS ARE CONDUCIVE TO COLLUSION

37.     Several important economic characteristics of the market for Anti-Vibration Rubber Parts render it plausible that there was collusion among Anti-Vibration Rubber Parts suppliers.

*Market Concentration*

38.     The market for Anti-Vibration Rubber Parts is highly concentrated.

*High Barriers to Entry*

39.     A collusive arrangement that raises product prices above competitive levels would, under normal circumstances, attract new entrants seeking to benefit from the supra-competitive pricing.  New entrants would, in turn, decrease the market power of the co-conspirators and diminish their ability to successfully maintain supra-competitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely.  Therefore, high barriers to entry help facilitate a cartel.

11181572.1

40.     There are high barriers to entry in the market for Anti-Vibration Rubber Parts. Entry requires a company to incur significant start-up capital expenditures.  A new entrant into the business would have to incur millions of dollars in costs, including capital expenditures on plants and equipment, as well as transportation, electricity, infrastructure for distribution, and labor.  A new entrant would also have to have assured relationships with significant customers in order to justify its substantial investments of capital.

*Price Inelasticity*

41.     When a seller of goods or services can increase prices without suffering a substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relatively inelastic.   Otherwise, increased prices would result in declining sales, revenues, and profits.

42.     Anti-Vibration Rubber Parts are required for vehicles that use internal combustion engines; there are no viable substitute products.  Therefore, pricing for Anti-Vibration Rubber Parts is highly inelastic.

*Opportunities for Collusion*

43.     Defendants attended industry events that created opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

**DEFENDANTS' ANTITRUST CONSPIRACY**

44.     During the Class Period, Defendants and their co-conspirators conspired to rig bids for, to allocate the supply of, and to raise, fix and maintain prices for Anti-Vibration Rubber Parts sold in or into the United States.

45.     Defendants and their co-conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy.

11181572.1

46.     Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss bids and price quotations for Anti-Vibration Rubber Parts sold in or into the United States.

47.     Defendants and their co-conspirators agreed during their meetings, conversations, and communications to allocate among themselves the supply of Anti-Vibration Rubber Parts sold in or into the United States.

48.     Defendants, their subsidiaries, affiliates and entities of which the Defendants are the ultimate parent, sold Anti-Vibration Rubber Parts to customers in the United States and elsewhere at collusive and non-competitive prices.

49.     Defendants accepted payments for Anti-Vibration Rubber Parts sold in the United States and elsewhere at collusive and non-competitive prices.

50.     Defendants and their co-conspirators agreed during their meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

51.     Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

52.     Defendants and their co-conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

53.     Defendants and their co-conspirators affirmatively undertook measures to conceal their unlawful conduct.

54.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

55.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

56.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

57.     When OEMs purchase Anti-Vibration Rubber Parts directly from the supplier to whom they awarded the contract, the OEMs purchase the Anti-Vibration Rubber Parts at the winning price.

58.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Anti-Vibration Rubber Parts directly from the winning bidder for incorporation into products manufactured for and sold to OEMs.  Those suppliers and other direct purchasers who directly purchase Anti-Vibration Rubber Parts from the winning bidder, its subsidiaries, affiliates or entities of which the winning bidder is the ultimate parent, pay at least the winning price.  The OEM price sets the floor for pricing of Anti-Vibration Rubber Parts to direct purchasers from Defendants, their subsidiaries, affiliates or entities of which the Defendants are the ultimate parent.

59.     Defendants' conduct persisted for many years.  Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

11181572.1

60.     Among other conduct, Defendants manipulated the RFQ process to accomplish their conspiracy.

61.     As part of their conspiracy, at times Defendants agreed to submit bids that would allow the supplier that had the existing Anti-Vibration Rubber Parts business for a particular model to win the Anti-Vibration Rubber Parts business for the successor model.

62.     Defendants and their co-conspirators coordinated their Anti-Vibration Rubber Parts pricing.  They submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other.  They exchanged pricing information not just to ensure that the agreed-upon party would win the business, but also to ensure that the losing bidders would look competitive in order to have the opportunity to bid for future business.

63.     Defendants and their co-conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy.  These activities included, but were not limited to, the following:

a.      Agreeing to unlawfully coordinate pricing for, and allocate sales of, Anti-Vibration Rubber Parts.  For example, in responding to RFQs, Defendants and their co-conspirators agreed that the incumbent supplier would be the preferred bidder, and to price their bids to effect this agreement.

b.      Colluding with regard to RFQs for Anti-Vibration Rubber Parts business by agreeing on pricing and then communicating agreed-upon prices to Defendants' subsidiaries in the U.S., where the prices were submitted collusively.

c.      Discussing and exchanging pricing information with regard to Anti-Vibration Rubber Parts RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and

11181572.1

exchanges and adjustments of Anti-Vibration Rubber Parts pricing before submission to OEMs in the United States and elsewhere.

64.     Defendants and their co-conspirators knew and intended that their actions regarding their sales of Anti-Vibration Rubber Parts to motor vehicle manufacturers would have a direct impact on prices for Anti-Vibration Rubber Parts sold to all direct purchasers in the United States.

65.     Defendants' single price-fixing conspiracy involving Anti-Vibration Rubber Parts impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Anti-Vibration Rubber Parts from Defendants, their subsidiaries, affiliates or entities of which the Defendants are the ultimate parent.

## ANTITRUST INVESTIGATION

66.     On November 16, 2012, the United States Department of Justice ("DOJ") announced that Hiroshi Yoshida, an executive at the Ohio subsidiary of a Japanese automotive supplier, had pleaded guilty for his role in a conspiracy to fix prices and rig bids of Anti-Vibration Rubber Parts sold in the United States and elsewhere.  Yoshida agreed to serve 12 months and one day in a U.S. prison and to pay a $20,000 criminal fine.

67.     In September 2013 the DOJ announced that Toyo Tire & Rubber Co., Ltd., executive Tetsuya Kunida had agreed to plead guilty and to serve 12 months and one day in a U.S. prison and to pay a $20,000 criminal fine for his role in an international conspiracy to fix prices and rig bids of Anti-Vibration Rubber Parts sold in the United States and elsewhere.

68.     In October 2013 Yamashita Rubber Co., Ltd., agreed to plead guilty and to pay an $11 million criminal fine for its role in a conspiracy to fix the prices of Anti-Vibration Rubber Parts installed in cars sold in the United States and elsewhere.

11181572.1

69.     In November 2013 the DOJ announced that Toyo Tire & Rubber Co. Ltd. had agreed to plead guilty and to pay a $120 million criminal fine for its role in a conspiracy to fix the prices of Anti-Vibration Rubber Parts installed in cars sold in the United States and elsewhere.

70.     Also in November 2013 the DOJ announced that Masao Hayashi of Toyo Automotive Parts (USA), Inc., and Kenya Nonoyama of Toyo Tire & Rubber Co., Ltd., had been indicted in the U.S. District Court for the Northern District of Ohio for their roles in an international conspiracy to fix prices of Anti-Vibration Rubber Parts sold to Toyota and installed in U.S. cars.

71.     In February 2014 the DOJ announced that Bridgestone Corporation had agreed to plead guilty and to pay a $425 million criminal fine for its role in a conspiracy to fix prices of Anti-Vibration Rubber Parts installed in cars sold in the United States and elsewhere.  This fine is the second largest fine to date resulting from the entire U.S. Department of Justice Antitrust Division criminal investigation of the automotive parts industry.

72.     According to a one-count felony charge filed in U.S. District Court for the Northern District of Ohio, Bridgestone Corporation engaged in a conspiracy to allocate sales of, to rig bids for and to fix, raise and maintain the prices of Anti-Vibration Rubber Parts it sold to Toyota Motor Corp., Nissan Motor Corp., Fuji Heavy Industries Ltd., Suzuki Motor Corp., Isuzu Motors Ltd. and certain of their subsidiaries, affiliates and suppliers, in the United States and elsewhere.

73.     The Department of Justice enhanced the criminal penalty against Bridgestone Corporation because it is a repeat offender and concealed the Anti-Vibration Rubber Parts cartel conspiracy even from the U.S. Department of Justice when it pleaded guilty to another price

11181572.1

fixing conspiracy in 2011. The Justice Department stated, "In October 2011, Bridgestone pleaded guilty and paid a $28 million fine for price-fixing and Foreign Corrupt Practices Act violations in the marine hose industry, *but did not disclose at the time of the plea that it had also participated in the anti-vibration rubber parts conspiracy. Bridgestone's failure to disclose this conspiracy was a factor in determining the $425 million fine*." (emphasis supplied).

74.     In April 2014 the DOJ announced that Bridgestone Corp. executive Yusuke Shimasaki had agreed to plead guilty and to serve 18 months in a U.S. prison and to pay a $20,000 criminal fine for his role in an international conspiracy to fix prices and rig bids of Anti-Vibration Rubber Parts sold in the United States and elsewhere.

75.     Also in April 2014 the DOJ announced that three executives of Bridgestone Corporation—Yoshiyuki Tanaka, Yasuo Ryuto and Isao Yoshida—had been indicted in the U.S. District Court for the Northern District of Ohio for their roles in an international conspiracy to fix prices of Anti-Vibration Rubber Parts sold in the United States and elsewhere. The DOJ investigation and prosecution of those criminal defendants is ongoing.

## CLASS ACTION ALLEGATIONS

76.     Plaintiffs bring this action on behalf of themselves, and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representatives of a Class defined as follows:

> All direct purchasers of Anti-Vibration Rubber Parts (excluding Defendants and their past and present parents, subsidiaries, affiliates and joint-ventures) in the United States from any of the Defendants (or their controlled subsidiaries, affiliates, joint-ventures, or entities of which they are the ultimate parent) during the Class Period.

77.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable. The exact number of Class members is unknown to

Plaintiff.  The identity of the members of the Class can be readily determined from information and records Defendants possess or control through their subsidiaries, affiliates or joint ventures.

78.     Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they have paid artificially inflated prices for Anti-Vibration Rubber Parts as a result of Defendants' anticompetitive and unlawful conduct.

79.     Plaintiffs will fairly and adequately protect and represent the interests of the Class.  Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

80.     Plaintiffs are represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

81.     Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

82.     There are core questions of law and fact common to the Class, such as:

a.     Whether Defendants conspired to fix, raise, maintain, or stabilize prices of, to allocate, or to rig bids for, Anti-Vibration Rubber Parts;

b.     Who participated in the conspiracy and how long it lasted;

c.     Whether the conspiracy caused Anti-Vibration Rubber Parts prices to be higher than they otherwise would have been;

d.     Whether Defendants' conduct caused injury to the business or property of Plaintiffs and members of the Class;

e.     Whether Defendants' conduct violated Section 1 of the Sherman Act;

17

f.      Whether Defendants undertook actions to conceal their unlawful conspiracy; and

g.      How to measure the damages suffered by the Class.

83.     A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system.  A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

## ANTITRUST INJURY SUFFERED BY PLAINTIFFS AND THE CLASS

84.     Defendants' anticompetitive conduct has had the following effects:

a.      price competition has been restrained, suppressed, or eliminated with respect to Anti-Vibration Rubber Parts;

b.      the prices of Anti-Vibration Rubber Parts have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.      purchasers have been deprived of free and open competition in the Anti-Vibration Rubber Parts market.

85.     As a result of Defendants' contract, combination, or conspiracy, Plaintiffs and other Class members paid higher prices for Anti-Vibration Rubber Parts than they would have in the absence of the conspiracy, and Plaintiffs and other Class members have sustained injury to their business or property.

18

11181572.1

## PLAINTIFFS' CLAIMS ARE TIMELY

86.     Plaintiffs and other Class members had no knowledge or notice of the anticompetitive conduct alleged herein.

87.     Plaintiffs and other Class members did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein.

88.     No information about the Anti-Vibration Rubber Parts conspiracy was in the public domain or otherwise available to Plaintiffs or the Class and there was no or insufficient information to suggest that Defendants were involved in an Anti-Vibration Rubber Parts conspiracy.

89.     Fraudulent concealment by Defendants also tolled the statute of limitations on the claims asserted by Plaintiffs and the Class.  Defendants affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class, from at least as early as March 1, 1996.  Because of this, Plaintiffs and the Class did not learn or discover the operative facts giving rise to this Complaint.

90.     Plaintiffs and the Class were unaware of Defendants' unlawful conduct, and did not know that they were paying supra-competitive prices for Anti-Vibration Rubber Parts during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs or other members of the Class that would have suggested that they were being injured by Defendants' unlawful conduct.

91.     The affirmative acts by the Defendants alleged herein were wrongfully concealed and carried out in a manner that precluded detection.

11181572.1

92.     By its very nature, Defendants' anti-competitive conspiracy was inherently self-concealing.  Because Anti-Vibration Rubber Parts are not exempt from antitrust regulation, Plaintiffs and the Class reasonably believed that the market for Anti-Vibration Rubber Parts was competitive.

93.     Defendants represented publicly that their pricing and bidding activities were unilateral, rather than being based on anticompetitive agreements.  In making those false representations, Defendants misled Plaintiffs and the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer-allocation, and price-fixing activities.

94.     Defendants' wrongful conduct was carried out in part through means and methods that were designed to prevent detection, and which for a long time succeeded in preventing detection.

95.     In particular, Defendants participated in meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

96.     During these meetings, conversations, and communications, Defendants agreed upon bids and price quotations to be submitted to customers in the United States and elsewhere.

97.     Defendants likewise agreed to allocate the supply of Anti-Vibration Rubber Parts sold to customers in the United States and elsewhere on a model-by-model basis.

98.     Defendants also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

99.     In accordance with their agreements, Defendants submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

11181572.1

100.    Plaintiffs and the Class could not have discovered the conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and to fraudulently conceal, their conduct.

101.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims was tolled.

## COUNT I: CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

102.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth here.

103.    Defendants entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

104.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

105.    Commencing at least as early as March 1, 1996, and continuing for many years, the exact dates being currently unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Anti-Vibration Rubber Parts, creating anticompetitive effects.

106.    Defendants' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Anti-Vibration Rubber Parts throughout the United States.

11181572.1

107.    As a result of the conspiracy alleged herein, the prices charged to Plaintiffs and the other members of the Class for Anti-Vibration Rubber Parts were unlawfully raised, fixed, maintained, or stabilized in the United States.

108.    The conspiracy has had the following effects:

a.    prices paid by Plaintiffs and the Class for Anti-Vibration Rubber Parts were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.    Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Anti-Vibration Rubber Parts; and

c.    competition in the market for Anti-Vibration Rubber Parts has been unlawfully restrained, suppressed, or eliminated.

109.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been damaged, and will continue to be damaged, by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

110.    The conspiracy is a *per se* violation of the federal antitrust laws.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and in favor of the Class herein, and respectfully request the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

11181572.1

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

C.      That Plaintiffs and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiffs and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: November 15, 2016                    /s/ David H. Fink
                                            David H. Fink (P28235)
                                            Darryl Bressack (P67820)
                                            Nate Fink (P75185)
                                            FINK + ASSOCIATES LAW
                                            38500 Woodward Avenue; Suite 350
                                            Bloomfield Hills, MI 48304

11181572.1

Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com
nfink@finkandassociateslaw.com

Gregory P. Hansel
Randall B. Weill
Jonathan G. Mermin
Michael S. Smith
PRETI, FLAHERTY, BELIVEAU
  & PACHIOS LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
jmermin@preti.com
msmith@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

11181572.1

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN KODROFF
   & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkw-law.com
bcaldes@srkw-law.com
jjagher@srkw-law.com
jspector@srkw-law.com

Irwin B. Levin
Scott Gilchrist
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ilevin@cohenandmalad.com
sgilchrist@cohenandmalad.com

Linda P. Nussbaum
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9102
lnussbaum@nussbaumpc.com

John G. Emerson
EMERSON SCOTT, LLP
830 Apollo Lane
Houston, TX 77058
Telephone: (281) 488-8854
jemerson@emersonfirm.com

David G. Scott
EMERSON SCOTT, LLP
The Rozelle-Murphy House
1301 Scott Street
Little Rock, AR 72202
Telephone: (501) 907-2555
dscott@emersonfirm.com

11181572.1

Solomon B. Cera, Esq.
CERA LLP
595 Market Street
Suite 2300
San Francisco, CA 94105
Telephone: (415) 977-223
scera@cerallp.com

M. John Dominguez
COHEN MILSTEIN SELLERS
& TOLL PLLC
2925 PGA Boulevard, Suite 204
Palm Beach Gardens, FL 33410
Telephone: (561) 833-6575
jdominguez@cohenmilstein.com

Matthew W. Ruan
COHEN MILSTEIN SELLERS
& TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
mruan@cohenmilstein.com

David A. Young
COHEN MILSTEIN SELLERS
& TOLL PLLC
1100 New York Avenue, NW
Suite 500
Washington, DC  20005
Telephone:  (202) 408-4600
dyoung@cohenmilstein.com

*Counsel for Plaintiffs Jerry A. Anderson, Sr.,
Laura L. LaRue, Christopher A. Lee and the
Proposed Class*

11181572.1